**Kevin TRUDEAU, Plaintiff,**

v.

**FEDERAL TRADE COMMISSION, Defendant.**

**No. CIV.A. 05–0400JDB.**

United States District Court, District of Columbia.

Aug. 25, 2005.

Daniel Mach, Daniel J. Hurtado, David J. Bradford, Jenner & Block, Washington, DC, for plaintiff.

Dake S. Cutini, Jane M. Lyons, Department of Justice, Office of Consumer Litigation, Washington, DC, for defendant.

## MEMORANDUM OPINION

BATES, District Judge.

Plaintiff Kevin Trudeau is an advocate of alternative health products, a producer of infomercials, and a vocal critic of the defendant Federal Trade Commission ("FTC"). On September 2, 2004, the FTC entered into a settlement agreement with Trudeau that resolved an enforcement action the agency had commenced against him for alleged deceptive trade practices.

Several days later, the FTC issued a press release that Trudeau believes mischaracterizes the settlement agreement. Trudeau then proceeded to bring this action against the FTC, alleging that the press release exceeds the agency's statutory authority and reflects an effort to retaliate against his criticism of the agency in violation of his First Amendment rights. Trudeau has now filed a motion for a preliminary injunction, and the FTC has filed a motion to dismiss. For the reasons set out below, the Court concludes that Trudeau does not state a viable cause of action as a matter of law. The Court therefore denies Trudeau's motion for a preliminary injunction, and grants the FTC's motion to dismiss.

## BACKGROUND

Plaintiff Kevin Trudeau is a prominent author and producer of television infomercials, through which he promotes and markets alternative health products to the public. Compl. ¶¶ 1–2. He is also an outspoken critic of the FTC. *Id.* ¶ 8. For several years, the FTC has been pursuing legal action against Trudeau, alleging that his infomercials mislead consumers about supposed cures for serious diseases (such as cancer and multiple sclerosis) and common conditions (such as hair loss and obesity). This case arises out of a press release the FTC issued in the wake of a settlement of one of those legal proceedings.

In January 1998, the FTC filed a complaint against Trudeau in the United States District Court for the Northern District of Illinois, claiming that he had engaged in the false and deceptive marketing of certain products in violation of the Federal Trade Commission Act ("FTC

Act"). As just one example, the complaint alleged that Trudeau had promoted a product known as "Eden's Secret Nature's Purifying Product," which Trudeau claimed would cause significant weight loss; prevent or cure ailments such as arthritis, depression, premenstrual syndrome, immune suppression, fatigue and headaches; cleanse the body of harmful toxins; and purify the body's blood supply. At the same time that the FTC filed the complaint, it submitted a stipulated order for permanent injunction and final judgment settling all charges against Trudeau. Trudeau had signed and agreed to the terms of this order, which, among other things, prohibited him from making the claims challenged in the complaint with regard to the products described in the complaint or any similar products, and required him to pay $500,000 into a fund for purchasers of the products. The FTC issued a press release announcing the settlement. *See* Mem. Supp. of FTC's Mot. to Dismiss ("Def.Mem.") at 4–5.

In late 2001 and again in August 2002, Trudeau produced and appeared in infomercials for a product called "Coral Calcium Supreme." [1] Compl. ¶¶ 11–12; Def. Mem. at 6–7. Trudeau also produced infomercials during this period to sell a product called "Biotape." Def. Mem. at 7. The FTC took two steps in response to these infomercials. First, the FTC filed a motion in June 2003 for an order to show cause why Trudeau should not be held in contempt of the 1998 order. Second, the FTC initiated a new action against Trudeau and several other defendants in the United States District Court for the Nothern District of Illinois alleging that the marketing of these products was false and deceptive. According to that complaint,

---

[1] FTC refers to this product as "Coral Calcium Supreme." Def. Mem. at 6–7. Trudeau refers to the product as "Coral Calcium." Compl. ¶¶ 11–12. To avoid confusion, the Court uses the term "Coral Calcium Supreme," since that is the language employed in the press release at issue in this case.

Trudeau marketed Coral Calcium Supreme as an effective treatment for cancer, multiple sclerosis, lupus, other autoimmune diseases, and heart disease and high blood pressure, and alleged that Biotape, a substance similar in appearance to electrical tape, contained "space age mylar" that "connects the broken circuits" in the body that cause pain. Def. Mem. at 7.[2]

On July 1, 2003, the parties agreed to, and the court entered, a stipulated preliminary injunction that prohibited Trudeau from making any of the challenged claims for Coral Calcium Supreme and Biotape. Compl. ¶ 15; Def. Mem. at 8. A year later, on June 7, 2004, the FTC moved that Trudeau be held in civil contempt for violating the terms of the preliminary injunction by continuing to promote Coral Calcium Supreme. On June 29, 2004, the court granted the FTC's motion, and again ordered Trudeau to cease all advertising for Coral Calcium Supreme. Def. Mem. at 8. Several weeks later, the FTC and Trudeau entered into a "stipulated final order for permanent injunction and settlement of claims for monetary relief" resolving the FTC's motion to have Trudeau held in contempt of the 1998 order, the FTC's motion to have Trudeau held in contempt of the 2003 stipulated preliminary injunction, and the 2003 complaint. Compl. ¶ 18, Ex. A. The court entered a final order on September 2, 2004. Id.

The order bars Trudeau "from producing, disseminating, making or assisting others in making any representation in an infomercial aired or played on any television or radio media." Compl., Ex. A, at 8. The order recognizes an exception to this ban for representations in any television or radio media in connection with the marketing of "any book, newsletter or other informational publication" provided that the publication does not reference any product or service that Trudeau is marketing, does not advertise any product or service related to the content of the publication, and is not sold or marketed in conjunction with a product or service related to the content of the publication. Id. The order also bars Trudeau from manufacturing or marketing "any product containing coral calcium" or any of the products challenged in the 1998 lawsuit, or from making representations regarding the benefits of any product unless the representation is true and not misleading. Id. at 10–13. Finally, the order enters "[j]udgment for equitable monetary relief in the amount of two million dollars" against Trudeau and the other defendants. Id. at 16.

The order provides that the United States District Court for the Northern District of Illinois "shall retain jurisdiction of this matter for purposes of construction, modification and enforcement of this Order." Id. at 29. The order resolves the FTC's motion to have Trudeau held in contempt of the 1998 order, the FTC's motion to have Trudeau held in contempt of the 2003 stipulated preliminary injunction, and the 2003 complaint. Id. at 28; Def. Mem. at 8. The order finally provides that the defendants "expressly deny any wrongdoing or liability for any of the matters alleged in the Complaint and the civil contempt action. There have been no findings or admissions of wrongdoing or liability by the Defendants or Relief Defendants other than the finding against Kevin Trudeau for contempt of Part I of the Stipulated Preliminary Injunction, entered by the Court on June 29, 2004." Id. at 3–4.

Five days later, on September 7, 2004, the FTC issued a press release announcing

---

**2.** The Commission had earlier commenced actions against two other infomercials in which Trudeau participated, but Trudeau himself was not charged in connection with those infomercials. Def. Mem. at 6 n. 5.

the stipulated order. Compl. ¶ 19, Ex. B. The press release bears the title "Kevin Trudeau Banned from Infomercials," and the subtitle "Trudeau Settles Claims in Connection with Coral Calcium Supreme and Biotape." Compl., Ex. B, at 1. The first sentence of the press release states:

A Federal Trade Commission settlement with Kevin Trudeau—a prolific marketer who has either appeared in or produced hundreds of infomercials—broadly bans him from appearing in, producing, or disseminating future infomercials that advertise any type of product, service, or program to the public, except for truthful infomercials for informational publications.

*Id.* The first paragraph of the press release closes with the statement that "Trudeau agreed to these prohibitions and to pay the FTC $2 million to settle charges that he falsely claimed that a coral calcium product can cure cancer and other serious diseases and that a purported analgesic called Biotape can permanently cure or relieve severe pain." *Id.*

The third paragraph of the press release quotes an FTC official about the case:

"This ban is meant to shut down an infomercial empire that has misled American consumers for years," said Lydia Parnes, Acting Director of the FTC's Bureau of Consumer Protection. "Other habitual false advertisers should take a lesson; mend your ways or face serious consequences."

*Id.* The remainder of the press release describes in greater detail the allegations against Trudeau and the terms of the settlement. *See id.* The fifth paragraph explains that the court had earlier found Trudeau in contempt of court for violating a preliminary injunction and "ordered Trudeau to cease all marketing for coral calcium products." *Id.*

The sixth paragraph describes the stipulated final order announced that day as a "settlement," and reminds the reader again that the "order's ban on future infomercials exempts infomercials for books, newsletters, and other informational publications." *Id.* The eighth paragraph provides that the "stipulated final order for permanent injunction was entered in the U.S. District Court for the Northern District of Illinois, Eastern Division on September 3, 2004." *Id.* at 2. Finally, a note at the bottom of the press release states in full:

**Note:** This stipulated final order is for settlement purposes only and does not constitute an admission by the defendants of a law violation. A stipulated final order has the force of law when signed by the judge.

*Id.* at 2. The press release was placed on the FTC's website in September 2004, and remains there to this day.[3]

A substantial number of news outlets reported on the settlement, most of them appearing to rely in large measure on the FTC press release. Stories about the settlement appeared on CNN, and in the New York Times, Los Angeles Times, and Washington Post, among others. Mem. Supp. Pl.App. Prelim. Inj. (Pl.Mem.), Ex. C. Several reports described the order without qualification as a "ban" on infomercials and a "fine" of Trudeau. *E.g.,* Pl. Mem., Ex. C, at 22–24. An Associate Press article picked up by numerous other media outlets characterized the stipulated final order as a "ban" and a "fine[ ]," and quoted FTC Official Lydia Parnes characterizing Trudeau as a "habitual false ad-

---

**3.** Trudeau alleges that a search of the name "Kevin Trudeau" on the "Google" internet search engine returns the FTC Press Release as the second highest non-sponsored link (at the time of the writing of this opinion, it is the highest non-sponsored link, after several sponsored links for Trudeau's books). Compl. ¶ 8.

vertiser." Pl. Mem., Ex. C, at 33–46. However, the article also described the order as a "settlement," and explains at the close of the piece that the prohibition on infomercials "exempts infomercials for books, newsletters and other informational publications." *Id.* The majority of the news reports that Trudeau submitted to the Court mention the exception to the order's prohibition on infomercials. Pl. Mem., Ex. C, at 21, 28, 33–46, 51–58.

Several other reports also described the exception in the order for publications and referred to the order as a settlement. For example, one day after the press release, the Washington Post reported that "the Federal Trade Commission *largely* kicked Trudeau off television," and that the "settlement" allows Trudeau to "continue to sell products such as the book for sale on his Web site . . . unless he makes claims favoring one cure or another." Frank Ahrens, *FTC Pulls Plug on Infomercial Giant*, Washington Post, Sept. 8, 2004, at E1. ABC News recently reported that "the agreement imposes on Trudeau an unprecedented lifetime ban from the infomercial industry, except infomercials for publications, including books," and the Associated Press recently again described the order as a "settlement" that "broadly" bans Trudeau from infomercials "except for truthful infomercials for informational publications." Pl. Mem., Ex. C at 31; Ex. J. at 28–29 (emphasis added).[4]

Trudeau alleges that the negative publicity generated by the FTC press release "has adversely affected [his] ability to purchase media time and to market his books and informational publications." Compl. ¶ 46. He cites four examples of adverse impact. Three of the incidents involved vendors who contacted Trudeau in the belief that he had been banned from the infomercial business. Each time, a Trudeau representative explained the settlement to the vendor, and there was no further incident. Pl. Mem., Ex. H ¶ 5; Ex. I ¶¶ 5–6. The final example involved an arrangement with television personality Ed McMahon in which McMahon had agreed to host an interview show promoting one of Trudeau's books. On March 7, 2005, Trudeau received a message that McMahon's wife had found the September 2004 press release on the FTC website, and that "the extent of the problems, litigations, civil contempts, etc., referenced on the site have scared McMahon to the point that he wants no involvement" with Trudeau. Pl. Mem., Ex. G. McMahon withdrew from the deal. Trudeau acknowledges that a recent book he wrote has enjoyed commercial success, selling more than one million copies, and that this has occurred after he signed the stipulated order and the FTC published the press release. Compl. ¶¶ 2, 37.

Over five months after the press release was issued and placed on the FTC's web site, Trudeau contacted the FTC asking them to remove the press release from the web site. When the FTC declined, Trudeau commenced this action on February 28, 2005,[5] alleging that the FTC exceeded its statutory authority under 15 U.S.C.

---

4. The ABC News story aired on March 3, 2005, and was a report on the filing of this lawsuit. *See* Compl., Ex. J. at 1–2. Trudeau complains that even in that report, an FTC staff attorney was quoted as saying that he "would describe [Trudeau] as being a habitual fraud artist." *Id.* at 31. Aside from that story, all of the media reports cited by plaintiff were published in September 2004, although many of them remain available for viewing on the Internet. *See id.* at 1–62; Pl. Mem. at 8.

5. On the same day, Trudeau also filed a complaint against the United States in the Court of Federal Claims alleging that the 2004 stipulated order was a contract and that the government breached that contract in issuing the press release. *See Trudeau v. United States*, No. 05–263C (Fed.Cl.).

§ 46(f) and violated the First Amendment in issuing what Trudeau characterizes as a false and retaliatory press release. Compl. ¶¶ 48–51. The complaint seeks a declaratory judgment that the press release misrepresents the September 2004 stipulated order and violates the First Amendment, and an injunction requiring the FTC to "refrain from continuing its unlawful conduct" and to "undertake appropriate corrective measures." Compl. at 14.

Shortly thereafter, Trudeau filed a motion for a preliminary injunction, asking the Court to order the FTC to modify the press release to (I) eliminate the false headline, (ii) make clear that the allegations in the press release are only allegations, and (iii) accurately reflect that there was no finding of false advertising against Trudeau and no assessment of a fine or penalty. The FTC filed an opposition to the motion in which it argues that the Court lacks jurisdiction because the press release is not final agency action subject to judicial review, that the press release does not mischaracterize the September 2004 order, that plaintiff cannot demonstrate irreparable harm, and that a preliminary injunction would not serve the public interest.

The Court held a hearing on the motion for a preliminary injunction on May 18, 2005. Thereafter, the FTC filed a motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1), again on the ground that the Court is without jurisdiction to hear the challenge to the press release because the press release is not final agency action, and under Federal Rule of Civil Procedure 12(b)(6), because the complaint fails to state a claim as a matter of law. Both the motion for a preliminary injunction and the motion to dismiss are fully briefed and ready for decision.

## STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) will not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C.Cir.1987). All that the Federal Rules of Civil Procedure require of a complaint is that it contain " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura Pharmaceuticals, Inc. v. Broudo,* —— U.S. ——, ——, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (quoting *Conley,* 355 U.S. at 47, 78 S.Ct. 99). "Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

"[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *see Leatherman v. Tarrant Cty. Narcotics and Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Phillips v. Bureau of Prisons,* 591 F.2d 966, 968 (D.C.Cir.1979). Therefore, the plaintiff must be given every favorable inference that may be drawn from the allegations of fact. *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683; *Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111,

1113 (D.C.Cir.2000). Conclusory legal and factual allegations, however, need not be considered by the court. *Domen v. Nat'l Rehabilitation Hosp.*, 925 F.Supp. 830, 837 (D.D.C.1996) (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).

Under Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has jurisdiction, and a court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F.Supp.2d 9, 13 (D.D.C.2001); *see also Pitney Bowes, Inc. v. United States Postal Serv.*, 27 F.Supp.2d 15, 19 (D.D.C.1998). " '[P]laintiff's factual allegations in the complaint ... will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge*, 185 F.Supp.2d at 13–14 (quoting 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350 (2d ed.1987)).

To prevail on an application for a preliminary injunction, a plaintiff must demonstrate (1) a substantial likelihood of success on the merits; (2) that he will suffer irreparable harm absent the relief requested; (3) that other interested parties will not be harmed if the requested relief is granted; and (4) that the public interest supports granting the requested relief. *Cobell v. Norton*, 391 F.3d 251, 258 (D.C.Cir.2004); *Katz v. Georgetown Univ.*, 246 F.3d 685, 687–88 (D.C.Cir.2001); *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1505–06 (D.C.Cir.1995); *Washington Area Metro. Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir. 1977).

In determining whether to grant urgent relief, the Court must "balance the strengths of the requesting party's arguments in each of the four required areas." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C.Cir.1995). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Id.* Because preliminary injunctions are extraordinary forms of judicial relief, courts should grant them sparingly. *Sociedad Anonima Vina Santa Rita v. United States Dep't of the Treasury*, 193 F.Supp.2d 6, 13 (D.D.C.2001); *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) ("It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.").

## ANALYSIS

The Court concludes that it is without jurisdiction to review Trudeau's claims in this case, and in the alternative, that the claims fail to state a viable cause of action as a matter of law. Trudeau also cannot show that he would suffer irreparable harm in the absence of an injunction, or that an injunction would be in the public interest. For all of these reasons, the Court will deny Trudeau's motion for a preliminary injunction, and grant the FTC's motion to dismiss.

## I. Lack of Jurisdiction

■ To establish the jurisdiction of a federal court over a cause of action against a federal agency, a plaintiff must locate both a waiver of the federal government's sovereign immunity and some authorization for judicial review of the challenged agency action. Trudeau purports to satisfy both of these requirements through the Administrative Procedure Act ("APA"). Section 702 of the APA waives sovereign immunity in certain actions against a federal agency:

A person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702. Section 704 of the APA then provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.[6] The central question in this case is whether the September 2004 press release is a "final agency action," such that the Court may review the claim under section 704 of the APA.

The APA defines an "agency action" as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The Supreme Court has explained that to be "final," an agency action must "mark the consummation of the agency's decisionmaking process, and must either determine rights or obligations or occasion legal consequences." *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 482, 124 S.Ct. 983, 157 L.Ed.2d 967 (2004) (quotation omitted); *see Bennett v. Spear*, 520 U.S.

154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Thus, actions that are "purely advisory and in no way affected the legal rights of the relevant actors," fall outside the definition of "final agency action." *Bennett*, 520 U.S. at 178, 117 S.Ct. 1154.

No court has ever found a press release to be a final agency action under the APA. Nonetheless, both the D.C. Circuit and the Fourth Circuit have allowed that agency publicity could, in certain circumstances, come within the definition of final agency action, most likely as an agency "sanction."[7] *See Invention Submission Corp. v. Rogan*, 357 F.3d 452, 457 (4th Cir.2004) ("Inasmuch as the APA's definition of 'agency action' includes agency sanctions, adverse publicity might be a 'sanction' and therefore an agency action in certain circumstances."); *Indus. Safety Equip. Assoc., Inc. v. Envtl. Prot. Agency*, 837 F.2d 1115, 1119 (D.C.Cir.1988) ("[A]n agency intent on penalizing a party through adverse publicity, especially false or unauthorized publicity, might well merit a review of its action."); *Impro Prods., Inc. v. Block*, 722 F.2d 845, 847 (D.C.Cir.1983) (criticizing interpretation of "final agency action" that "would preclude judicial review under the APA of an agency's dissemination of information that is concededly false and, therefore, completely inconsistent with the statutory purpose of promoting a prosperous agriculture").

■ These decisions suggest that, were a press release ever to qualify as a final agency action, it would be in a case where one and preferably both of two conditions were present. First, there would be evi-

---

6. *See Ostrow v. Sec'y of Air Force*, 48 F.3d 562, 1995 WL 66752, at *1 (D.C.Cir.1995) (section 702 "waives sovereign immunity" while section 704 "provides for judicial review" of certain agency action).

7. The APA defines "sanction" to include "the whole or a part of an agency—(A) prohibition, requirement, limitation, or other condition affecting the freedom of a person; (B) withholding of relief; (C) imposition of penalty or fine; (D) destruction, taking, seizure, or withholding of property; (E) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees; (F) requirement, revocation, or suspension of a license; or (G) taking other compulsory or restrictive action." 5 U.S.C. § 551(10).

dence that the agency was "intent on penalizing" a private party through adverse publicity. *Indus. Safety*, 837 F.2d at 1119; *see also Invention Submission Corp.*, 357 F.3d at 457 (declining to find final agency action where the Patent and Trademark Office's advertising campaign did not reflect "an intent to penalize any particular company"). Second, there would be evidence that the press release was demonstrably or concededly false. *See Indus. Safety*, 837 F.2d at 1119 (finding agency publication recommending against use of certain respirators did not qualify as a final agency action where plaintiff neither offered "evidence that the Guide was intended to penalize producers or consumers of the ... criticized respirators, nor evidence that the Guide is false").[8]

■ This avenue for judicial review of agency publicity must be applied with care. As indicated, no court has actually held that judicial review is available at all for agency publicity. It is fair to regard a press release as resting at the outermost boundaries of the definitions of both "final" and "agency action" (if it could ever be said to come within the definitions at all). Moreover, even those opinions that have held open the possibility of judicial review for some instances of agency publicity have recognized that press releases serve an essential role in "promoting Congress' clear mandate that government informa-

tion, particularly from consumer-oriented agencies, reach the public." *Indus. Safety*, 837 F.2d at 1118. Therefore, the cases emphasize that in the ordinary case, such publicity is "properly challenged through the political process and not the courts." *Invention Submission Corp.*, 357 F.3d at 459 (quotation omitted); *see also Indus. Safety*, 837 F.2d at 1119 (noting the "broad consensus" that the potential for harm from agency publicity "is best controlled by internal agency restraint").

Mindful of these considerations, the Court concludes that the September 2004 FTC press release challenged in this case is not final agency action. First, there is no persuasive evidence that the agency issued the press release with an intent to penalize Trudeau. Although the complaint contains innuendo to the effect that the FTC has sought to retaliate against Trudeau for his criticism of the agency, Trudeau does not cite any evidence, either direct or circumstantial, that the press release was written a certain way in order to penalize Trudeau for his criticism of the agency. The mere fact that the FTC chose to issue a press release clearly is not evidence of an intent to penalize—the FTC "is specifically authorized by statute to publicize information acquired by it," and has long engaged in the practice of issuing press releases announcing its actions. *See Bristol–Myers Co. v. FTC*, 424 F.2d 935,

---

8. The FTC relies principally on the D.C. Circuit decision in *Hearst Radio v. FCC*, 167 F.2d 225 (D.C.Cir.1948), for the proposition that agency publicity could never constitute final agency action. The court in *Hearst Radio* concluded that an FCC report on the public service responsibilities of licensed broadcasters was not an agency "sanction." *Id.* at 227. The D.C. Circuit has since expressly shied away from a reading of *Hearst Radio* that would preclude a cause of action for all agency publicity. *See Indus. Safety*, 837 F.2d at 1118–19 ("The problem with *Hearst Radio's* absolute immunity rule for agency publications is its failure to accommodate two sepa-

rate goals of a fair administrative process: protecting parties from false or unauthorized agency news releases and promoting Congress' clear mandate that government information, particularly from consumer-oriented agencies, reach the public."); *Impro Prods.*, 722 F.2d at 849 (explaining that "we nonetheless have reason to question the continued validity of the *Hearst Radio* decision, particularly in a case such as this one in which there is a specific statutory authorization for dissemination of information," and that "we believe that *Hearst Radio* may no longer be a viable precedent").

940 (D.C.Cir.1970); *see FTC v. Cinderella Career & Finishing Schools*, 404 F.2d 1308, 1314 (D.C.Cir.1968) ("[T]here is in fact and law authority in the Commission, acting in the public interest, to alert the public to suspected violations of the law by factual press releases whenever the Commission shall have reason to believe that a respondent is engaged in activities made unlawful by the Act which have resulted in the initiation of action by the Commission" and "Congress obviously has long been aware of and acquiesced in the Commission's press release procedures.").[9]

Furthermore, the fact that the press release sets out the terms of a settlement preventing the distribution or marketing of what the agency believes to be a deceptive product, and contains a quote by agency officials describing the plaintiff and his marketing in negative terms, should not lead to a different result. As the D.C. Circuit explained several decades ago, although a press release may result "in a substantial tarnishing of the name, reputation, and status of the named respondent," if the "unsophisticated consumer is to be protected in any measure from deceptive or unfair practices, it is essential that he be informed in some manner as to the identity of those most likely to prey upon him utilizing such prohibited conduct." *Cinderella Career*, 404 F.2d at 1313; *see also Indus. Safety*, 837 F.2d at 1118 (explaining that the remedial powers of agencies "would be crippled were these agencies not permitted to use the quick and cheap instrument of publicity"); *Bristol–Myers Co. v. FTC*, 284 F.Supp. 745, 748 (D.D.C.1968) ("The courts may no more enjoin Government departments from issuing statements to the public than they may enjoin a public official from making a speech."), *rev'd in part on other grounds*, 424 F.2d 935 (D.C.Cir.1970). Trudeau cites to several other instances where he claims that the FTC has targeted him for his criticism of the agency, but all he describes are various steps the FTC has taken to carry out its duties under the FTC Act and its rights under the settlement agreement. The allegations that these incidents were run through with an intent to retaliate or penalize are conclusory.[10] Such allegations cannot transform the press release from a description of an earlier penalty or agency action (the September 2004 settlement) into an effort to impose an additional penalty or agency action on Trudeau.[11]

---

9. The statute authorizing the Commission to issue press releases provides that the agency shall have the power

   [t]o make public from time to time such portions of the information obtained by it hereunder as are in the public interest; and to make annual and special reports to the Congress and to submit therewith recommendations for additional legislation; and to provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use

   15 U.S.C. § 46(f).

10. So, for instance, while Trudeau complains that the FTC has "made substantial efforts to find a ground" to invoke a clause in his settlement agreement providing for a forfeiture if Trudeau misrepresented his financial status in negotiating the settlement, there is nothing suspicious on its face about the FTC undertaking an investigation of whether Trudeau failed to disclose assets in order to obtain a more favorable settlement. Compl. ¶¶ 37–42.

11. Thus, this is not a case where, for example, an agency was announcing a new rule of law in a press release without proceeding through the prescribed rule-making process. *See B.C. Morton Int'l Corp. v. FDIC*, 305 F.2d 692, 694 (1st Cir.1962) (allowing claim against press release to proceed where plaintiff alleged that agency "did not purport to construe the Act as written, but deliberately and intentionally attempted to add to the Act legal restrictions not justified by any reasonable and proper interpretation thereof").

Likewise, the press release is not appreciably false or misleading. Trudeau alleges that there are three inaccuracies in the press release. First, he claims that the title is false, in that it states only "Kevin Trudeau Banned from Infomercials," without mentioning that the settlement permits him to continue to develop infomercials relating to informational publications. Pl. Mem. at 15; Pl. Mot Dismiss Mem. at 27. This contention is unpersuasive. The very first line of the press release makes exactly the point Trudeau claims is missing, explaining that the settlement "broadly bans him from appearing in, producing, or disseminating future infomercials that advertise any type of product, service, or program to the public, *except for truthful infomercials for informational publications.*" Compl., Ex. B., at 1. The press release reminds the reader of this fact in the sixth paragraph. *See id.* ("The order's ban on future infomercials exempts infomercials for books, newsletters, and other informational publications."). By its nature, a title will not always capture the full detail of the document it is describing. Where the document itself accurately completes the picture not only once but twice, a court will not rewrite—or allow the plaintiff to rewrite—the portions that the plaintiff believes could be slightly more accurate or objective.

Second, Trudeau insists that the press release creates the "implication" that the court presiding over the settlement "found" that Trudeau was a "habitual false advertiser" and imposed a "fine" of $2 million. Pl. Mem. at 16; Pl. Mot. Dismiss Mem. at 28. However, the press release says no such thing. The "habitual false advertiser" language appears in a quote that is attributed clearly to Lydia Parnes, the Acting Director of the FTC's Bureau of Consumer Protection, not to the court. Furthermore, the press release never uses the word "fine," or otherwise conveys that the court was imposing a fine or penalty or making any findings. In fact, the press release describes the order as a settlement and a stipulated order on several occasions (including in the subtitle), and states that Trudeau "agreed" to the prohibitions and to pay the $2 million to the FTC. The press release is not the least bit inaccurate or misleading in this regard.[12]

Finally, plaintiff asserts that the press release "conspicuously omits" the fact that the court did not make a "finding of wrongdoing." Compl. ¶ 22. The press release contains a "Note," however, with that word highlighted in bold to draw the reader's attention, that states: "This stipulated final order is for settlement purposes only and does not constitute an admission by the defendants of a law violation." Compl., Ex. B., at 2. Although plaintiff complains that the stipulated final order contains a statement that the order does not reflect a "finding[ ] ... of wrongdoing," and yet the press release does not, Compl. ¶ 21, Ex. A, at 3, a press release is not obliged to repeat every word or phrase in a settlement, for obvious reasons. The

---

**12.** Trudeau's concern here seems to be that many media sources repeated the accusation that plaintiff was a "habitual false advertiser" and described the $2 million as a "fine." However, Trudeau does not cite a single report that interprets the press release as stating that *the court* found that Trudeau was a habitual false advertiser. The press releases merely quote Parnes for her description of Trudeau as a habitual false advertiser. A cause of action does not exist under the APA every time a government official characterizes someone the agency is investigating. *See Bristol–Myers,* 284 F.Supp. at 748 ("The courts may no more enjoin Government departments from issuing statements to the public than they may enjoin a public official from making a speech."). Similarly, the use of the word "fine" does not remotely suggest that the press release was misleading—the word "fine" fairly implies a payment to an agency at least as much as it does a payment to a court pursuant to an order.

failure of the press release to contain these particular words would be a greater cause for concern if the press release otherwise led to the impression that the stipulated order reflected a finding of wrongdoing. As discussed earlier, it does not.

Thus, the sum of the alleged errors in the press release consists of an exception to the prohibition on infomercials that is absent from the title of the press release but appears twice in its text; a purported reference to a judicial finding and penalty that in fact cannot be found in the press release at all; and the absence of language to the effect that the order was not a finding of wrongdoing. These are not the sort of misrepresentations that would lead the Court to conclude, for the first time, that a press release intentionally and falsely deviates from the settlement order so as to be a separate agency action under the APA. Fairly read, the press release is not inaccurate or misleading at all. It simply is not written quite to Trudeau's liking. Certainly the press release is not so false that it is "completely inconsistent with the statutory purpose" of the FTC to promote the consumer welfare, the standard suggested in one D.C. Circuit decision. *See Impro Products,* 722 F.2d at 847. Every press release can be shaded to be more or less objective, or a more or less accurate account of the agency action it is describing, but the Court will not assume the role of a scrivener of government publications.

Trudeau suggests that the press release must be misleading, because some press reports characterized the stipulated order as an unqualified ban on infomercials. However, the FTC cannot be blamed because certain media reports inaccurately reported an accurate press release. *See Invention Submission Corp.,* 357 F.3d at 460 (plaintiff's claimed adverse effect due to agency publicity "was based on the fact that a journalist linked Invention Submission with [the plaintiff]," and therefore "cannot be imputed to the [agency] for purposes of determining whether its conduct was a final agency action"). There is no indication that the agency was intending to hide the exception to the prohibition in the settlement—indeed, the text of the press release describes the exception twice. Finally, as noted earlier, most press reports accurately reported the exception. *See supra* at 6–7. The fact that certain media outlets did not does not give rise to a cause of action against the agency; otherwise government agencies would be exposed to constant liability for the inevitable inaccuracies and distortions of their statements in the media.

Plaintiff fails to cite any discernable harm that followed from either the press release or the media reports, a fact that casts at least some additional doubt on the significance of the alleged misrepresentations in either. By way of harm, Trudeau cites a handful of queries regarding the press release from third parties, and a single incident in which Ed McMahon backed out of an arrangement to interview Trudeau. However, the queries were resolved through a simple explanation without any further apparent problem. And the message conveying McMahon's decision to cancel the interview reveals that decision to be attributable not to the passages of the press release about which plaintiff complains, but to "the extent of the problems, litigations, civil contempts, etc." about Trudeau otherwise referenced on the FTC's web site. Compl., Ex. G.

Finally, Trudeau suggests that the Court should permit discovery to explore whether the press release qualifies as agency action. This request must be assessed against the usual procedures that govern actions under the APA, in which discovery normally is unavailable "except when there has been a strong showing of bad faith or improper behavior or when the record is so bare that it prevents effec-

tive judicial review." *Commercial Drapery Contractors v. United States*, 133 F.3d 1, 6 (D.C.Cir.1998) (quotation omitted). Neither of those prerequisites is present here. Plaintiff has made no showing of bad faith, and both the D.C. Circuit in *Indus. Safety* and the Fourth Circuit in *Invention Submission Corp.* dismissed challenges to the agency publicity in those respective cases for failure to show "final agency action" after a review of the publication at issue and the other relevant materials in the record but without discovery. As the Fourth Circuit explained, the "measure of the advertising campaign must be made by the information conveyed by it to the public." *Invention Submission Corp.*, 357 F.3d at 458–59. Trudeau cannot explain why a different result should obtain here. He requests, in essence, a rule that would allow a private party to root through the files of a federal agency to determine the motivation of any press release that does not track precisely the face of the document it is describing. The law does not countenance such a rule.[13]

Trudeau argues in the alternative that, even if he cannot show that the press release is final agency action under section 704 of the APA, this Court has jurisdiction independent of that provision. He contends that the general waiver of sovereign immunity in section 702 of the APA extends even to agency conduct that is not "final agency action" under section 704. There is some authority to support this proposition. *See, e.g., Dronenburg v. Zech*, 741 F.2d 1388, 1389 (D.C.Cir.1984); *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 521–23 (9th Cir. 1989).[14] However, even if Trudeau were correct that section 702 waives sovereign immunity in the absence of final agency action under section 704, Trudeau must identify some provision other than section 704 of the APA that gives rise to a cause of action against the FTC for acting outside of its statutory authority. *See Public Citizen v. U.S. Trade Representative*, 5 F.3d 549, 551 (D.C.Cir.1993) ("In drafting NEPA, however, Congress did not create a private right of action. Accordingly, Public Citizen must rest its claim for judicial review on the Administrative Procedure Act."). He is unable to do so.[15]

**13.** Even if the ordinary APA rules governing discovery were inapplicable, the presence of final agency action is a jurisdictional issue, *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 12 n. 4 (D.C.Cir.2005), and the scope of jurisdictional discovery "lies with the district court's discretion," *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1147 (D.C.Cir. 1994). The only specific form of fact-finding plaintiff requests is the opportunity to gather "expert and other evidence regarding the net impression the press release conveys to the public." Pl. Mot. Dismiss Mem. at 3. Given the similarity between the stipulated order and the press release, the Court does not see how this sort of discovery will shed light on the question of agency action. *See id.* ("Under the circumstances, we do not see what facts additional discovery could produce that would affect our jurisdictional analysis above and therefore conclude the district court did not abuse its discretion in dismissing the action when it did.").

**14.** *See also, e.g., Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir.1988) ("Contrary to the Secretary's second argument, the waiver of sovereign immunity contained in section 702 is not dependent on application of the procedures and review standards of the APA. It is dependent on the suit against the government being one for non-monetary relief.").

**15.** Trudeau relies on *B.C. Morton Int'l Corp. v. FDIC*, 305 F.2d 692 (1st Cir.1962), for the proposition that the federal courts possess the inherent power to consider whether an agency is acting outside of its statutory bounds. Not only would this proposition render section 704 irrelevant, but it misreads *B.C. Morton*, which reached the merits of a challenge to an agency press release apparently on the basis of the "sue and be sued" statute authorizing legal challenges against the FDIC. *Id.* at 694 n. 2. There is no similar provision for the FTC.

Trudeau nonetheless suggests that even if there can be no judicial review of his claim that the FTC exceeded its statutory authority, the Court has inherent jurisdiction over his First Amendment challenge (once section 702 of the APA is deemed to waive sovereign immunity). Once again, there is authority that lends support to this result. *See, e.g., The Presbyterian Church*, 870 F.2d at 523–25 (allowing First Amendment claim to proceed against various agencies in absence of final agency action). There is also law suggesting a contrary result—that Congress authorized but also placed limits on the judicial review of constitutional claims against federal agencies in sections 704 and 706 of the APA, and therefore a constitutional challenge can only be brought against final agency action. *See Robbins v. Wilkie*, 300 F.3d 1208, 1212 (10th Cir.2002) ("The APA is the proper avenue for reviewing an agency's action or decision.... However, the APA contains no remedy whatsoever for constitutional violations committed by individual federal employees unrelated to final agency action."); 5 U.S.C. § 706(2)(B) (authorizing a reviewing court to "hold unlawful and set aside agency action" that is "contrary to constitutional right"). The Court does not find it necessary to express its view on these questions of constitutional and administrative law, for even if Trudeau is permitted to bring a First Amendment claim against the FTC without satisfying the restrictions of the APA, he has not alleged facts sufficient to state such a claim.

## II. Failure to State a Claim

■ Trudeau purports to state a First Amendment claim against the FTC, arguing that the press release reflects an effort to retaliate against him for his criticism of the Commission. However, neither the allegations in the complaint nor the supporting documentation that Trudeau submits remotely supports such an accusation. He does not cite any statements or documents that even hint that the FTC was targeting him in response to his speech. The complaint sets out a sequence of events that Trudeau seems to believe suggests a retaliatory intent, but the sequence reveals the FTC commencing enforcement actions against Trudeau prior to the first acts of criticism by him identified in the complaint, and Trudeau continuing to criticize the FTC in the months following the press release. Compl. ¶¶ 9–10, 38. In the intervening period, there is no indication of any link between his criticism of the agency and the language of the press release.

The allegation that the FTC acted with an intent to retaliate against Trudeau is conclusory and unsupported. Such allegations are insufficient to overcome the Commission's motion to dismiss. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C.Cir. 2002) (courts considering motion to dismiss "accept neither inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint, nor legal conclusions cast in the form of factual allegations" (quotation omitted)); *Major v. Plumbers Local Union No. 5*, 370 F.Supp.2d 118, 126 (D.D.C.2005) ("Conclusory legal and factual allegations ... need not be considered by the court."). The bad faith of government actors is notoriously easy to allege and difficult to disprove, and Trudeau cannot avail himself of the discovery process in the hopes of stumbling upon such evidence where he can point to no indication that it exists to begin with. Trudeau's First Amendment claim therefore must be dismissed for failure to state a claim.

■ The same would be true of the cause of action against the FTC for exceeding its statutory authority to issue press releases under 15 U.S.C. § 46(f), were plaintiff able to establish the jurisdic-

tion of the Court over this claim. That provision authorizes the Commission:

> To make public from time to time such portions of the information obtained by it hereunder as are in the public interest; and to make annual and secret reports to the Congress and to submit therewith recommendations for additional legislation; and to provide for publication of its reports and decisions in such form and manner as may be best adapted for public information and use.

15 U.S.C. § 46(f). One decision recently indicated that a court presiding over an existing FTC enforcement action might have the ability to enjoin the FTC for exceeding its authority pursuant to section 46(f) if it could be shown that the FTC, in issuing false press releases, was acting in a manner that "somehow threatens the efficacy" of the enforcement action litigation. *FTC v. Freecom Comm., Inc.*, 966 F.Supp. 1066, 1068 (D.Utah 1997). Other courts have suggested that a cause of action could exist where a press release "did not fairly and accurately summarize the Commission's complaint." *Cinderella Career*, 404 F.2d at 1314 n. 10.

The facts of this case fall far short of the showing necessary to establish a claim against the FTC for exceeding its authority to issue press releases. As discussed in detail earlier in this opinion, the differences between the press release and the stipulated order are minor or illusory, and have not led to discernible injury to Trudeau. In this regard, this case is strikingly similar to *Freecom Comm.*, where the court undertook a careful examination of the press releases at issue, the legal documents they described, and the entire record in the case, to conclude that many of the challenged statements were true, others were clearly presented as a "statement of opinion" of agency counsel rather than fact, and what few inaccuracies the private parties were able to identify in the press release they were able to correct without any resulting harm. *Freecom Comm.*, 966 F.Supp. at 1068–71. On that record, the court in *Freecom Comm.* declined to impose an injunction.[16] This Court has reached the same conclusion. Once again, this is not a case where the press release at issue is so obviously false that it is "completely inconsistent with the statutory purpose" of the FTC and with the FTC's authority to publicize deceptive practices. *Impro Prods.*, 722 F.2d at 849. The statutory authority claim therefore must also be dismissed for failure to state a claim.

### III. Lack of Irreparable Harm and Public Interest

■ Because the case must be dismissed for failure to establish the jurisdiction of the Court and for failure to state a claim, the pending motion for a preliminary injunction must be denied as well. Trudeau does not have a substantial likelihood of success on claims that have not survived a motion to dismiss. Even if the Court had reached a different result on the motion to dismiss, however, the Court would nonetheless deny the motion for a preliminary injunction, for two additional reasons: Trudeau's failure to establish that he would suffer irreparable harm in the absence of an injunction pending trial, and the public interest that weighs against the imposition of the injunction.

A showing of irreparable harm is the sine qua non of the preliminary injunction

---

**16.** Even if there were a more convincing showing of falsehood in this case, a strong argument would exist that the proper recourse for the defendants is in the United States District Court for the Northern District of Illinois, which continues to exercise jurisdiction over its stipulated order and is better situated to interpret and compare that order to the press release.

inquiry. *Experience Works, Inc. v. Chao,* 267 F.Supp.2d 93, 96 (D.D.C.2003). To demonstrate that he would suffer irreparable harm if an injunction does not issue, plaintiff must show that the harm he faces is imminent and certain, rather than remote and speculative. *See Comm. in Solidarity v. Sessions,* 929 F.2d 742, 745–46 (D.C.Cir.1991) (irreparable harm is not present where plaintiff alleges "injuries neither extant nor presently threatened, but only merely 'feared' "); *Wisconsin Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C.Cir. 1985) ("the injury must be both certain and great; it must be actual and not theoretical"). Purely financial harm that can be recovered after a full trial on the merits is not "irreparable"—the harm must be one for which there is no other adequate remedy at law. *Wisconsin Gas Co.,* 758 F.2d at 674.

Trudeau has not demonstrated that he has suffered any harm at all from the challenged portions of the press release, much less that he is certain to incur irreparable harm again in the imminent future. As indicated, he does not claim that he sustained any financial or other harm when he received a handful of calls from business relations confused about the nature of the settlement. The only other form of harm Trudeau has identified in his papers is the loss of an interview with Ed McMahon. Not only did Trudeau fail to come forward with evidence showing that this harm is fairly traceable to the claimed falsehoods in the papers, but the evidence he did submit indicates otherwise. *See supra* at 286. Even if the McMahon incident could be linked to the challenged components of the press release, it is a single, isolated incident that occurred several months ago (in March of 2005). Trudeau does not claim that he has been harmed in any way from the press release since that incident, or explain how such harm necessitates an injunction because it cannot be remedied after a trial on the merits. In all these ways, Trudeau has failed to establish irreparable harm.

Trudeau nonetheless contends that, even if he will not suffer financial injury in the absence of an injunction, he will suffer harm to his reputation. Trudeau is correct that reputational injury can be used to establish irreparable harm in certain circumstances. *Patriot, Inc. v. U.S. Dep't of Housing & Urban Dev.,* 963 F.Supp. 1, 5 (D.D.C.1997) ("Moreover, plaintiffs have demonstrated irreparable harm in damage to their business reputation."); 11A Wright & Miller, Federal Practice and Procedure: Civil 2d § 2948.1, at 159 (1995) ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable."). However, as with all other forms of irreparable harm, the showing of reputational harm must be concrete and corroborated, not merely speculative. *See Bristol–Myers Squibb Co. v. Shalala,* 923 F.Supp. 212, 215 (D.D.C.1996) (rejecting claim of irreparable harm due to reputational harm that was "based solely upon conjecture"); *Aeronautical Indus. Dist. Lodge 776, Intern. Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Gen. Dynamics Corp.,* 738 F.Supp. 1038, 1041 (N.D.Tex. 1990) ("As for the potential threat of humiliation or injury to reputation, it is tenuous and speculative...."). Here, Trudeau has offered no documents, statements, or testimonials demonstrating that he has suffered harm to his reputation as a result of the press release, or that such harm is certain to continue if the court does not impose an injunction. In fact, Trudeau's own complaint alleges that his most recent book has sold over a million copies, and that this "commercial success" occurred after the publication of the press release, hardly a fact indicative of reputational harm. Compl. ¶ 37.

The final factor of the preliminary injunction inquiry also counsels against imposing an injunction in this case. The federal courts have consistently recognized that there is a strong public interest in allowing the FTC to disclose and publicize information about its proceedings. As the D.C. Circuit observed several decades ago:

> If the unsophisticated consumer is to be protected in any measure from deceptive or unfair practices, it is essential that he be informed in some manner as to the identity of those most likely to prey upon him utilizing such prohibited conduct. Certainly advice through news media as to the actions being taken by a government agency in his behalf constitutes a prophylactic step addressed ultimately to the elimination of the conduct prohibited by the statute.

*Cinderella Career*, 404 F.2d at 1314; *see also Hoxsey Cancer Clinic v. Folsom*, 155 F.Supp. 376, 377–78 (D.D.C.1957) ("The defendants are performing a public duty when they are urging the use of certain treatments or warning the public against the use of certain treatments."). Although truly false and libelous press releases might merit relief, exposing an agency to burdensome and invasive litigation each time a press release differs even negligibly from the legal document it describes—or each time the title of the press release allegedly fails to capture fully all of the details of the underlying document—would chill the very publication of agency activity that the law encourages, *see* 15 U.S.C. § 46(f), and the public welfare requires. The Court declines to proceed down that path today.

## CONCLUSION

For the reasons stated above, plaintiff's motion for a preliminary injunction is denied, and defendant's motion to dismiss is granted. A separate order will issue.

1. The name of the current Secretary has been substituted pursuant to Fed.R.Civ.P. 25(d)(1).

## ORDER

Upon consideration of [3] plaintiff's motion for a preliminary injunction, [14] defendant's motion to dismiss, and the entire record in this case, and for the reasons stated in the Memorandum Opinion issued on this date, it is this *25th* day of August, 2005, hereby

**ORDERED** that plaintiff's motion for a preliminary injunction is **DENIED**, and it is further

**ORDERED** that defendant's motion to dismiss is **GRANTED**.